**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| SHARON MITCHELL, | ) CASE NO. 1:21-CV-01992-CEH |
| Plaintiff, | ) |
| | ) MAGISTRATE JUDGE |
| v. | ) CARMEN E. HENDERSON |
| | ) |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | ) |
| | ) **MEMORANDUM ORDER & OPINION** |
| Defendant, | ) |

**I. Introduction**

Plaintiff, Sharon Mitchell ("Claimant"), seeks judicial review of the final decision of the Commissioner of Social Security denying her application for Period of Disability ("POD") and Disability Insurance Benefits ("DIB"). This matter is before me by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF No. 13). For the reasons set forth below, the Court REVERSES the Commissioner of Social Security's nondisability finding and REMANDS this case to the Commissioner and the administrative law judge ("ALJ") under Sentence Four of § 405(g).

**II. Procedural History**

Claimant filed applications for POD and DIB on November 2, 2019, alleging on onset date of June 14, 2014. (ECF No. 7, PageID #: 151). The applications were denied initially and upon reconsideration, and Claimant requested a hearing before an ALJ. (ECF No. 7, PageID #: 151). On April 16, 2021, an ALJ held a telephonic hearing, during which Claimant, represented by counsel, and an impartial vocational expert testified. (ECF No. 7 PageID #: 151). Claimant's attorney made

an oral motion to change Claimant's onset date to January 1, 2019 at the hearing. (ECF No. 7, PageID #: 182). On May 26, 2021, the ALJ issued a written decision finding Claimant was not disabled. (ECF No. 7, PageID # 148). The ALJ's decision became final on September 29, 2021, when the Appeals Council declined further review. (ECF No. 7, PageID #: 27).

Claimant filed her Complaint to challenge the Commissioner's final decision on October 21, 2021. (ECF No. 1). The parties have completed briefing in this case. (ECF Nos. 12, 14). Claimant asserts the following statement of issues:

> (1) Whether the ALJ erred in her evaluation of the persuasiveness of opinion evidence.
>
> (2) Whether new and material evidence warrants remand.

(ECF No. 12 at 1).

### III. Background

#### A. Relevant Hearing Testimony

The ALJ summarized the relevant testimony from Claimant's hearing:

> [T]he claimant testified she lives with her husband and son. She testified her husband has MS and her son is developmentally handicapped. She testified she cares for her husband and son. She testified she drives. She testified she participates in physical therapy. She testified she has problems with walking and getting around. She testified she has arthritis in the metatarsals of her left foot and knee. She testified her knee had to be replaced. She testified she has scar tissue above her knee. She testified she has pain in her neck and shoulder. She testified she no longer wants to go the store anymore. She testified she has pain everywhere. She testified that moving and getting around hurts. She testified she sleeps in a recliner. She testified she is fragile and she cannot move. She testified she is on a consistent 9/10 on the pain scale. She testified she is on infusions for her arthritis. She testified she has very little energy. She testified her hand goes numb from holding her cell phone. She testified she goes shopping. She testified she prepares easy meals. She testified her son carries the laundry basket and empties the dryer for her. She testified her son helps her with the vacuuming. She testified she does not do the yardwork and she pays someone to cut her grass and

> shovel the snow. She testified she takes a nap every day for a couple of hours. She testified she pay bills. She testified she could sit for 20 minutes and then she has to get up. She testified she has to sit in a recliner with her feet up for the majority of the day. She testified she could stand for a couple of minutes and then she has to change positions. She testified she could walk from her house to her car in the driveway, which is approximately 20-25 feet. She testified she tries not to lift any weights but she will lift less than 5 pounds if necessary. She testified she has the most pain in her hips, thighs, knees and feet. She testified she has problems with her right arm and hand. She testified that her neck is curved. She testified that her right fingers are twisted. She testified she has difficulty writing and sometimes her hand goes numb. She testified that sometimes she could hold things in her right hand. She testified she does not have much strength in her right hand. She testified she uses a cane every day. She testified she has been using a cane since she had a knee replacement. She testified she uses the cane to prevent falls and it keeps her steady when walking. She testified she elevates her legs 95% of the day. She testified she elevates her legs to reduce pain and swelling. She testified that she has constant pain when she is awake. She testified that ice numbs her pain. She testified that physical therapy in the pool helps. She testified that for her right shoulder, she had surgery, she participates in physical therapy and she swims.

(ECF No. 7, PageID #: 158–59).

### B. Relevant Medical Evidence

The ALJ also summarized Claimant's health records and symptoms

> X-ray of the cervical spine on April 4, 2019 demonstrated reversal of lower cervical lordosis with degenerative disc space narrowing at C5-6 and C6-7 with cervical spondylosis (Exhibit 2F). X-ray of the right shoulder showed osteophytosis of the undersurface of the anterior acromion is seen but the acromiohumeral joint space is maintained. There is a 8mm sclerotic lesion within the proximal right humeral diaphysis most likely represents bone island.

> Cervical spine x-ray on September 27, 2019 showed degenerative disc disease at C5-6 and C6-7 and to a lesser extent at C7-T1 with spondylosis of lower cervical spine (Exhibit 4F, p. 7). There is bony foraminal impingement on the right at C6-7 due to uncovertebral joint spurring. Right shoulder x-ray showed subacromial osteophytosis. No fracture or dislocation. Probable bone island proximal humeral diaphysis.

3

Bone scan on October 14, 2019 showed no evidence for abnormal activity corresponding with the location of the small sclerotic lesion proximal right humerus (Exhibit 4F, p. 5). Bone island remains a likely etiology. Right knee prosthesis without evidence for loosening or infection. Bilateral midfoot degenerative changes.

John S. Bucchieri, M.D., evaluated the claimant on October 28, 2019 for her right shoulder pain (Exhibit 7F, p. 2). She slipped and fell in July and sustained a pulling injury to the right shoulder. Since then, she has noted pain in the superior portion of the shoulder. It radiates down the arm and bothers her at night. It is worse when she does dishes. She notes clicking and popping in the shoulder. She has been undergoing a physical therapy program three times a week in the pool without much relief. She has neck pain as well as some numbness in the fingers. Examination noted she is alert and oriented x3. She has a normal gait. She has full range of motion of the neck without pain. She is nontender over the posterior aspect of the cervical spine. She has a negative Spurling's sign. There is no significant atrophy of the muscles of the rotator cuff or right upper extremity. Right shoulder has 150 degrees of forward elevation, external rotation to 50 and internal rotation to L5. She is tender to palpation over the subacromial bursa, has positive impingement sings and pain with rotator cuff strength testing. Supraspinatus strength is 4/5 and external rotation strength is 5/5. She is non-tender over the acromioclavicular joint, posterior joint line or biceps tendon. She has a negative cross-adduction test, negative lift-off test. The long head of the biceps is intact. Provocative tests for biceps tendonitis/labral injury are negative. She has full range of motion in the elbow, wrist and hand. Provocative tests for carpal tunnel syndrome, including Tinel's, Phalen's, and median nerve compression test were negative. Motor strength in both upper extremities is otherwise 5/5. Sensation is intact in all digits. Radial pulse is palpable. Deep tendon reflexes including biceps, triceps, and brachioradialis are 2+ and symmetric. X-rays of the shoulder demonstrate no fractures, arthritis, or bony lesions. She has a type 2 acromion with a large subacromial spur. Her right shoulder pain is going on for four months since her injury despite a structured physical therapy program.

Magnetic resonance image (MRI) of the right shoulder on October 31, 2019 showed full-thickness rotator cuff tear involving nearly the entire supraspinatus with partial extension into the anterior and mid fibers of the infraspinatus (Exhibit 4F). Retraction of musculotendinous fibers to the level of the glenoid is noted. Moderate to severe atrophy supraspinatus and moderate atrophy

infraspinatus. Partial undersurface tearing subscapularis with medial subluxation biceps tendon. Biceps tenosynovitis. Sprain of the inferior glenohumeral ligament.

Dr. Bucchieri evaluated the claimant on November 4, 2019 for her right shoulder pain (Exhibit 7F). The claimant has had continued pain in the right shoulder without significant change. Physical examination findings are without change from October. MRI demonstrates a massive rotator cuff tear with retraction back to the level of the glenoid. The claimant may be a possible candidate for superior capsular reconstruction of the shoulder.

Gregory Sarkisian, D.O., evaluated the claimant on November 8, 2019 for her complaint of bilateral knee pain (Exhibit 6F). She reported that her right knee is worse and she has a lot of swelling. Her skin is very sensitive around the knee. She reports that the right leg will go completely numb at night when laying down. She reports swelling in both knees. She had right total knee replacement approximately 5-1/2 years ago. She has had some pain and hypersensitivity in her knee ever since her surgery. Physical examination reveals full extension of the right knee with flexion beyond 120°. She has no significant soft tissue swelling. She has a well-healed midline incision. There is no collateral instability or flexion instability appreciated. There was no gross effusion palpable. Good strength is appreciated. She has no pain with hip rotation. She does exhibit some soreness in the lumbosacral junction with flexion and extension of her lumbar spine without gross signs of radiculopathy. X-rays of both knees show satisfactory position and alignment of the nickel free Stryker total knee replacement. There are no signs of loosening. Good alignment is appreciated. Her contralateral left knee reveals osteoarthritis, severe in the patellofemoral joint, moderate in the medial joint, slight varus deformity noted. She does exhibit some hypersensitivity along the lateral aspect of her knee incision on the right knee down to the mid shin region. She was assessed with unilateral primary osteoarthritis of both knees.

Eric M. Parsons, M.D., evaluated the claimant on November 19, 2019 for her complaint of right shoulder pain (Exhibit 7F, p. 5). The claimant presented with a four-month history of severe right shoulder pain. She had an incident in July 2h3n she slipped on a wet floor, landing onto her right shoulder. She had severe pain and inability to lift her arm. She does have some history of some neck issues and she has had a little bit of radiating discomfort and numbness down the arm, but this is intermittent. Examination noted she is in no acute distress. She is alert and oriented x3 with

appropriate mood and affect. She walks with a well-balanced gait. Examination of the right shoulder area demonstrates no swelling, deformity, or atrophy. She has passive range of motion of 60/160/T10. She has 4-/5 power in the supraspinatus and infraspinatus. She has mildly positive belly press test and lift off test, positive Near and Hawkins impingement signs, positive Speed and Yergason signs. She is neurovascularly intact distally. She was assessed with nontraumatic complete tear of right rotator cuff and spontaneous rupture of flexor tendon of right shoulder. The impression is right shoulder rotator cuff tear with long head biceps tendon tear with subluxation.

On December 4, 2019, the claimant underwent right shoulder arthroscopic rotator cuff repair, right shoulder arthroscopic biceps tenodesis, and right shoulder arthroscopic acromioplasty with subacromial decompression (Exhibit 7F, p. 8).

Dr. Parsons evaluated the claimant on December 18, 2019 for follow-up of her right shoulder arthroscopic rotator cuff repair (Exhibit 8F, p. 5). The claimant is two weeks out from surgery and she is doing well. Her pain has been well controlled. There were no issues with her wounds. Examination of her right shoulder demonstrates well-healed incisions, intact motor and sensory function distally. She was assessed with nontraumatic complete tear or right rotator cuff and spontaneous rupture of flexor tendons, right shoulder.

Jeffrey C. Lupica, DPM, evaluated the claimant on January 31, 2020 for her complaint of left foot pain and tenderness (Exhibit 15F, p. 4). The pain is worse when wearing a close toed shoe. She has increased pain with direct pressure over the top of her left foot. She has tried topical analgesic cream and NSAIDs without much relief. There were no other pedal complaints. Examination noted she was alert and in no distress. Lower extremity examination noted alignment satisfactory, no gross deformity and normal in stance. Peripheral pulses were palpable. Her skin was warm and dry, with no rash or skin lesions and no open wounds or signs of infections. Lymphadenopathy negative. Peripheral sensation and reflexes are intact. Muscle strength +5/+5. Range of motion was normal. There was pain and tenderness with palpation noted over the second and third tarsometatarsal joints. Palpable exostosis is noted over the dorsum of the left foot. There is mild edema noted on the dorsum of the left foot. There is no pain or bony crepitation with ankle joint range of motion. X-ray of left foot and ankle showed no fracture or dislocation. Severe degenerative changes are noted to the second third tarsometatarsal joints. Dorsal marginal osteophyte formation is

noted over the tarsometatarsal joint. She was assessed with degenerative joint disease of left midfoot and pain in left foot. She underwent a cortisone injection.

Dr. Parson evaluated the claimant on March 25, 2020 for follow-up of her right shoulder arthroscopic rotator cuff repair (Exhibit 16F, p. 8). The claimant is a little over three months out from her surgery. She continues to do exceptionally well. She has no significant pain in the arm and she has had remarkable gains in terms of her range of motion and function. She has progressed very nicely with her physical therapy. She reports she has continued to experience some symptoms in her hand of occasional numbness and tingling and also some general dysfunction with activities such as writing. She had some similar symptoms in her non-operative left hand. On examination, she was in no acute distress. She is alert and oriented x3 with appropriate mood and affect. She walks with a well-balanced gait. Examination of the right shoulder area demonstrates no swelling or deformity. She has full unrestricted range of motion of the shoulder, full power on strength testing. She has complete composite flexion of all of her fingers with good grip strength. No discernable loss of sensation to light touch. Examination of her left upper extremity for comparison demonstrates no abnormality in terms of appearance, range of motion, strength or stability. Examination of the cervical and lumbar spine and bilateral lower extremities is unremarkable in terms of appearance, range of motion, strength or stability. She was assessed with nontraumatic complete tear of right rotator cuff.

Anabelle Morales Mena, M.D., evaluated the claimant on May 6, 2020 for her widespread joint pain, swelling and deformity of hand joints (Exhibit 11F). She complained of pain, inflammation, trouble with legs, feet, knees, hip, numbness in hands, back mid left pain, and bottom mid. She reported twisting finger joints and arthritis in the feet. She can hardly move due to pain. Stiffness seems all day and worse with inactivity. She has chronic back lumbosacral pain with stiffness that is worse with extension and better with flexion. She cannot lay on her bed due to back pain. She is sleeping on a recliner due to back pain. Her lateral hips are tender. Arthritis is limiting her activities of daily living, but she is the caregiver for her husband who is bed ridden. Examination noted she was alert, attentive and in no acute distress. The neck was supple. The lungs were clear to auscultation. She had a regular heart rate and rhythm with no murmur, rub or gallop. She had tenderness to palpation and swelling noted in the MCPs and DIP nodes. She has tenderness to palpation and swelling in the knees. She has tenderness to palpation in MTPs, midfoot, lateral hips, greater trochanters, and over lumbar

and sacroiliac (SI) joints. She had limited right shoulder internal rotation. She had difficulty and pain noted as she was getting up from [sitting.] She is able to flex her spine, but she has tenderness with extension. She had an antalgic gait and she used a cane to ambulate. Cranial nerves were grossly intact. She had good muscle tone and bulk. She was oriented x3 with a normal mood, affect, insight and judgment. She was assessed with spondyloarthritis, polyarthritis with negative rheumatoid factor, Vitamin D deficiency, gout with manifestations, ankylosing spondylitis, unspecified site of spine, sicca, postmenopausal and obesity.

X-ray of the bilateral hands on May 6, 2020 demonstrated osteoarthritis of the bilateral hands (Exhibit 11F, p. 19). X-ray of the bilateral feet showed no radiographic evidence of inflammatory arthropathy. However, there is severe left midfoot osteoarthrosis versus neuropathic changes. X-ray of the sacroiliac joints shoed no acute findings and normal sacroiliac joints.

X-ray of the right humerus on May 8, 2020 showed no acute fracture or dislocation (Exhibit 11F, p. 20). Bone density study showed lumbar spine evaluation demonstrates osteopenia. The hip evaluation demonstrates osteoporosis.

Telemedicine visit on May 13, 2020 reflects her blood sugars have been higher due to steroids (Exhibit 14F). The claimant stated she has a blood pressure cuff at home, but she does not use it. She reported she was complaint with her blood sugar medications. She continues to be a caregiver for her husband who has MS. She quit smoking 2 years ago and she denied alcohol or illicit drug use or abuse. She was assessed with essential hypertension, type 2 diabetes mellitus without complication, GERD with esophagitis and pain in unspecified joint.

Carrie Cales, CNP, evaluated the claimant on July 10, 2020 for her diabetes mellitus (Exhibit 13F). The claimant denied episodes of hypoglycemia. She reported she is not always checking her glucose. She reported that overall her joints are starting to feel better. Examination noted she was awake, alert and in no acute distress. The lungs were clear to auscultation. She had a regular heart rate and rhythm with no murmurs or extra tones. She had bilateral digit disfigurement. Her skin was warm, dry and intact. There were no rashes or lesions.

On July 24, 2020, the claimant reported that she was adherent and tolerating SSZ 500mg daily for about 2½ months and it is starting to help with joint pain, stiffness and mobility (Exhibit 18F, p. 25). She

8

reported that as soon as she stopped the steroids, the swelling resumed. She reported she was unable to make a fist. Examination noted she was alert, attentive and in no acute distress. The neck was supple. There was tenderness to palpation and swelling in the MCPs with DIP nodes, in the knees, midfoot, lateral hips, greater trochanters, and over the lumbar and sacroiliac joints. She had difficulty and pain getting up from sitting. She was able to flex the spine, but she had tenderness with extension. She ambulated with an antalgic gait and she used a cane. Cranial nerves were grossly intact. She had good muscle tone and bulk. She had a normal mood, affect, insight and judgment. She was assessed with seronegative rheumatoid arthritis of multiple sites, other osteoporosis without current pathological fracture, gout with manifestations and other chronic pain.

Dr. Parsons noted on September 30, 2020 the claimant achieved full function in the shoulder and she was having no pain (Exhibit 16F, p. 5). Unfortunately, two weeks ago she began to develop some discomfort in the shoulder. This seemed to occur after she began sleeping on this side. This has reached a level where she is struggling with ability to elevate her arm away from her body. She feels this also into her neck area. She has considerable pain at night. Examination of the right shoulder demonstrates no swelling, deformity or atrophy. She has passive range of motion of 60/160/T10. She can maintain a forward elevated position of her arm against gravity, but she has difficulty with active elevation above shoulder height. She has full power on external rotation strength and testing, negative belly press and left off tests, positive Neer and Hawkins impingement signs, negative biceps, labral, and instability signs. She is neurovascularly intact distally. Examination of the left shoulder demonstrates no abnormality in terms of appearance, range of motion, strength or stability. Examination of the cervical and lumbar spine and bilateral lower extremities is unremarkable in terms of appearance, range of motion, strength or stability. She was assessed with bursitis of right shoulder. She underwent corticosteroid injection.

Dr. Lupica evaluated the claimant on October 13, 2020 (Exhibit 15F). She presented for follow-up evaluation of pain and tenderness on top of her left foot. She has been experiencing pain and tenderness for several years. She had previous relief from cortisone injections. Now her pain is starting to move along the medial arch. The pain is worse when wearing a close toed shoe. She has increased pain with direct pressure over the top of her left foot. Examination noted pain and tenderness of palpation noted over the dorsal midfoot. There is tenderness with palpation noted along the course

of the posterior tibial tendon. No joint effusions are noted. No surrounding erythema. She was assessed with degenerative joint disease of left midfoot, pain in left foot, and posterior tibial tendinitis, left leg. She underwent cortisone injection.

Dr. Parson evaluated the claimant on October 14, 2020 for her right shoulder pain (Exhibit 16F). The claimant reported she had very minimal improvement following a corticosteroid injection. She has continued to experience tremendous difficulty with lifting and rotational movements. She has considerable pain at rest. Examination noted she walked with a well-balanced gait. Examination of the right shoulder area demonstrated no swelling, deformity or atrophy. She has passive range of motion of 40/150/L4. She has 4-/5 power in the supraspinatus, and 4+/5 in the external rotators. She had negative belly press and lift off tests. She is neurovascularly intact distally. Examination of the left shoulder demonstrates no clear abnormality in terms of appearance, range of motion, strength or stability. Examination of the cervical and lumbar spine and bilateral lower extremities is unremarkable in terms of appearance, range of motion, strength or stability. X-ray of the right shoulder demonstrates no significant degenerative change. Normal appearing radiography. She was assessed with bursitis of right shoulder.

MRI of the right shoulder on October 26, 2020 demonstrated acute nondisplaced fracture distal acromion (Exhibit 25F). Rotator cuff repair without definite MR evidence of re-tearing. Mild subacromial bursitis.

On December 1, 2020, the claimant reported that she started Emerall injections weekly and she was currently on her 4th injection (Exhibit 17F). She reported the injections were not helping her rheumatoid arthritis. He has pain in her knees and cramping in her thighs.

Dr. Morales Mena evaluated the claimant on December 7, 2020 (Exhibit 18F, p. 33). The claimant reported that since her last appointment she developed an unusual shoulder stress fracture. She is currently a little bit better and it was not burning; however, she continues with what sounds like worsening back, hip, thigh achy burning of bones of hands and swelling with muscle cramping mostly left leg and feet unchanged. She is going to physical therapy. Examination remains unchanged from July 24, 2020. She was assessed with seronegative rheumatoid arthritis of multiple sites.

On January 13, 2021, the claimant underwent Actemra infusion (Exhibit 19F).

Dr. Parsons evaluated the claimant on February 3, 2021 for her complaint of left knee pain (Exhibit 23F, p. 5). The claimant indicated that for a number of years she has struggled with severe pain in her left knee. She has difficulty with all manner of weight bearing activity. She requires the use of a cane to assist with her ambulation. She has had injection in this knee in the past. She is status post right total knee replacement and she has done pretty well with this. She does have pain at rest. She does have locking, catching, and giving-way episodes. Examination of her left knee demonstrates a mild effusion. She has tenderness to palpation along the medial joint line area. She has range of motion from 5 to 115 degrees with crepitation. She has stable knee to ligament testing. Calf is soft, supple, nontender. Negative Homans sign. Examination of her right knee for comparison demonstrates no clear abnormality in terms of appearance, range of motion, strength or stability. X-ray of the left knee demonstrates severe osteoarthritis with complete loss of the medial compartment joint space and patellofemoral compartment joint space, with extensive osteophyte formation. The impression was severe degenerative change of the left knee joint. She was assessed with unilateral primary osteoarthritis, left knee.

Bradley T. Webb, M.D., evaluated the claimant on February 9, 2021 for her left knee pain (Exhibit 23F). The claimant stated she has had progressive pain from along the medial joint line for the past several years. The pain is disabling. She has difficulty with standing, walking and sitting in position. She uses a cane for ambulation assistance. Examination noted she was in no acute distress. Peripheral pulses were 2+. Muscle strength was 5/5 in the lower extremities without deficit, sensation intact to light touch without deficit, and negative straight leg raise bilaterally. Left hip had painless range of motion. Left knee had no swelling, bruising or erythema of the soft tissue. She was tender to palpation along with medial joint space. Active motion is from 5 to 120 degrees. Neutral alignment. Stable in extension. Patella tracks with severe crepitation. Compartments are soft throughout. Neurovascularly intact. She was assessed with unilateral primary osteoarthritis, left knee and nickel allergy.

On February 10, 2021, the claimant underwent a second Actemra infusion (Exhibit 27F).

The claimant participated in physical therapy for her right shoulder pain, low back pain and neck pain (Exhibits 5F, 8F, 12F, 16F, 22F and 26F). Several notes indicate the claimant is obese. At a height of 63 inches and with a weight of 2421 pounds, the claimant's body

11

mass index (BMI) is 42.86 (Exhibit 13F). BMI is the ratio of an individual's weight in kilograms to the square of his or her height in meters (kg/m²). The Clinical Guidelines issued by The National Institutes of Health define obesity as present in general where there is a BMI of 30.0 or above. A BMI of or over 40 is generally considered Level III or "extreme" obesity. Level III obesity carries the greatest risk of developing obesity-related impairments. Pursuant to SSR 19-2p, I have considered the limiting effects of the claimant's obesity. This includes that the combined effects of obesity with another impairment may be greater than the effects of each of the impairments considered separately.

(ECF No. 7, PageID #: 158–65).

### C. Opinion Evidence at Issue

Claimant had treating relationships with Dr. Anabelle Morales Mena, M.D. and Carrie Cales, CNP. The providers completed Medical Source Statements about Claimant's physical capacity. (ECF No. 7, PageID #: 166). The ALJ summarized their opinions in her decision:

> Dr. Morales Mena and Ms. Cales completed a Medical Source Statement: Patient's Physical Capacity on February 10, 2021 and February 23, 2021, respectively (Exhibits 20F and 21F, respectively). The claimant has rheumatoid arthritis, osteoarthritis, osteoporosis, gout and chronic back pain. She has significant joint pain, stiffness with weakness, difficulty with use of hands, transfers and ambulation. Dr. Morales Mena opined the claimant could lift and carry less than [ten] pounds both occasionally and frequently. She would have problems standing, walking and sitting. She could never climb, stoop, crouch, kneel or crawl. She could rarely balance. She could rarely reach, push/pull, fine manipulation or gross manipulation. Environmental restrictions include heights, moving machinery, temperature extremes and pulmonary irritants. She has been prescribed a cane and walker. She experiences moderate pain that interferes with concentration, takes her off-task and causes absenteeism. She needs to elevate her legs at 120 degrees. She would require additional unscheduled rest periods. She needs to constantly (less than 20-30 minutes) (sometimes less) switch positions due to pain and stiffness

(ECF N0. 7, PageID #: 166). However, the ALJ found their opinions unpersuasive:

> I find these opinions unpersuasive because the extreme restrictions are not supported or consistent with the evidence of record. The

12

> claimant can prepare meals, pay bills, go to doctor's appointments, take medications, shop, drive, read, get along with others, spend time with others, deal appropriately with authority, live with others, watch TV, manage funds, use the internet, handle self-care and personal hygiene and care for her husband who has MS.

(ECF No. 7, PageID #: 166).

## IV. The ALJ's Decision

The ALJ made the following findings relevant to this appeal:

> The claimant has the following severe impairments: degenerative disc disease, osteoarthritis and allied disorders, diabetes mellitus, gout, obesity, essential hypertension and asthma (20 CFR 404.1520(c)).
>
> 3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
>
> 4. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except: She could occasionally lift and carry 10 pounds and frequently lift and carry less than 10 pounds. She can push and pull within the lifting and carrying limitations. She can stand or walk for 2 hours in an 8-hour workday. She can sit for 6 hours of an 8-hour workday. She can occasionally push and pull with the bilateral lower extremities. She can occasionally climb ramps and stairs. She can never climb ladders, ropes, or scaffolds. She can occasionally stoop, kneel, crouch or crawl. She can have frequent exposure to fumes, odors, dusts, gases, and poor ventilation. She must avoid exposure to hazards (unprotected heights/dangerous machinery).
>
> 6. The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2019, the amended alleged onset date, through the date of this decision (20 CFR 404.1520(f)).

## V. Law & Analysis

### A. Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (en banc)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

**B. Standard for Disability**

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to DIB: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*,

14

459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.*

### C. Discussion

Claimant raises two issues on appeal. First, she challenges the ALJ's credibility findings for two experts, Dr. Anabelle Morales Mena and Ms. Carrie Cales, APN, and claims the ALJ improperly relied on Claimant's daily activities to discredit the experts' opinions. (ECF No. 12 at 14, 16–17). Second, she argues that new and material evidence obtained after the ALJ hearing warrants remand. (ECF No. 12 at 18).

The Court finds merit in Claimant's first contention that that ALJ's credibility finding was not supported by substantial evidence. Claimant argues the ALJ improperly discounted the experts' opinions based on her ability to complete basic daily activities. (ECF No. 12 at 14). She contends the ALJ's analysis "falters" because she failed to "evaluate the frequency, duration and effort needed to perform these basic activities, or directly compare these activities to a 40 hour work week," contrary to case law. (ECF No. 12 at 17 (citing *Rogers*, 486 F.3d at 248; *Lorman v. Comm'r of Soc. Sec.*, 107 F. Supp. 3d 829, 838 (S.D. Ohio 2015); *Osterland v. Colvin*, No. 3:15-cv-990, 2016 WL 4576092, at *10–*11 (N.D. Ohio Aug. 11, 2016)). Claimant lists a number of her conditions to demonstrate record support for the experts' opinions. (ECF No. 12 at 17–18). The Commissioner responds that "courts have repeatedly held that ALJs [may] appropriately cite to daily activities to highlight inconsistencies in the record" and that substantial evidence supports

15

the ALJ's credibility findings. (ECF No. 14 at 16 (citing *Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 441–42 (6th Cir. 2017)). The Commissioner also cites instances where the ALJ referred to positive treatment records to show the experts' opinions were inconsistent with the record. (ECF No. 14 at 16–17).

The ALJ summarized the opinions of Dr. Morales Mena and Ms. Cales:

> Dr. Morales Mena and Ms. Cales completed a Medical Source Statement: Patient's Physical Capacity on February 10, 2021and February 23, 2021, respectively (Exhibits 20F and 21F, respectively). The claimant has rheumatoid arthritis, osteoarthritis, osteoporosis, gout and chronic back pain. She has significant joint pain, stiffness with weakness, difficulty with use of hands, transfers and ambulation. Dr. Morales Mena opined the claimant could lift and carry less than [ten] pounds both occasionally and frequently. She would have problems standing, walking and sitting. She could never climb, stoop, crouch, kneel or crawl. She could rarely balance. She could rarely reach, push/pull, fine manipulation or gross manipulation. Environmental restrictions include heights, moving machinery, temperature extremes and pulmonary irritants. She has been prescribed a cane and walker. She experiences moderate pain that interferes with concentration, takes her off-task and causes absenteeism. She needs to elevate her legs at 120 degrees. She would require additional unscheduled rest periods. She needs to constantly (less than 20-30 minutes) (sometimes less) switch positions due to pain and stiffness.

(ECF No. 7, PageID #: 166).

The ALJ found these opinions unpersuasive because they included "extreme restrictions [that] are not supported or consistent with the evidence of record." (ECF No. 7, PageID #: 166). To support this finding, the ALJ merely stated

> The claimant can prepare meals, pay bills, go to doctor's appointments, take medications, shop, drive, read, get along with others, spend time with others, deal appropriately with authority, live with others, watch TV, manage funds, use the internet, handle self-care and personal hygiene and care for her husband who has MS.

16

(ECF No. 7, PageID #: 166). The ALJ does not provide any other justification for her credibility finding and appears to imply that Claimant's daily activities are inconsistent with the "extreme restrictions" of Dr. Morales Mena and Ms. Cales. But aside from listing Claimant's regular activities, the ALJ does not explain *why* these activities are inconsistent with the expert opinions. Further, the record does not provide insight into how these activities demonstrate an inconsistency with the experts' lifting, standing, walking, and resting recommendations.

Indeed, the record does not indicate the amount of lifting, standing, walking, and resting these daily activities require. The Commissioner points out that Claimant "cleaned, bathed, dressed, and cooked" for her husband, arguing that these activities show the experts' opinions are inconsistent with Claimant's activities. (ECF No. 14 at 16). However, there is no evidence indicating how much lifting, standing, or walking these activities require. Although the ALJ did not reference how many breaks Claimant takes during these activities, the Court notes that Claimant testified she had to "sit down every couple of minutes" when she cooked and cleaned. (ECF No. 9, PageID #: 209). Further, the record does not indicate how long it takes Claimant to complete these activities. Without additional information about the nature of these activities, the ALJ is simply speculating that they are inconsistent with the experts' opinion.

The Commissioner also fails to acknowledge the assistance caretakers provided Claimant. Claimant testified that hospice workers visited her home daily to bathe her husband. (ECF No. 7, PageID #: 202). She also testified that Medicare funded a caregiver to assist with her husband's care, and the ALJ noted that Claimant's son assisted her with certain household tasks including lifting laundry baskets and vacuuming. (ECF No. 7, PageID #: 159, 202). Without considering the caretakers' assistance, it is even more difficult to gauge the physicality of Claimant's activities. Additionally, Claimant's testimony about the daily hospice workers undermines the

17

Commissioner's argument that her caretaking responsibilities demonstrate that the experts' opinions are unnecessary and inconsistent with the record.

Without more evidence to support the ALJ's finding, the Court does not find that Claimant's daily activities alone prove the experts' opinions are unsupported by or inconsistent with the record. Thus, the Court finds that the ALJ's finding is not supported by substantial evidence.

The Commissioner cites *Shepard v. Commissioner of Social Security*, arguing that ALJs may refer to a claimant's daily activities to highlight inconsistencies in the record. 705 F. App'x at 441–42 (finding that the ALJ properly considered the claimant's daily activities to demonstrate that her subjective testimony about the severity of her symptoms and lifestyle was 'not entirely credible'). *Shepard* is distinguishable from this case. In *Shepard*, the Court specifically noted that the ALJ "cited these activities as evidence that Shepard's testimony about the severity of her symptoms and her limited lifestyle was 'not entirely credible,' not to demonstrate that she was capable of light work." 705 F. App'x at 441. The Court further held that it was "entirely appropriate for the ALJ to consider whether Shepard's asserted limitations were consistent with her ability to drive, prepare simple meals, shop, and go to eat or the movies and that [s]uch activity may be considered in making a credibility determination regarding a claimant's asserted limitations." *Id*. at 441–42.

Here, the ALJ did not rely on Claimant's daily activities to assess her credibility. Rather, the ALJ relied on Claimant's daily activities as the sole basis to assess the credibility of two medical opinions. This is more akin to the ALJ using Claimant's daily activities to demonstrate that the RFC is appropriate which the claimant argued was error in *Shepard*. While ALJs may consider a claimant's daily activities to support their RFC findings, the ability to complete

18

activities does not automatically establish a finding. *See Osterland*, 2016 WL 4576092, at *10 (finding that an ALJ's use of the claimant's daily activities to support a credibility determination was not dispositive absent information about why the evidence supported the finding). Rather, the ALJ must still explain *why* the activities demonstrate their point. *See id.*

Further, a claimant's ability to complete daily activities is not dispositive of their ability to work. *See Rogers*, 486 F.3d at 248 (finding that the claimant's ability to drive, clean her apartment, care for two dogs, complete laundry, read, stretch, and watch the news are "minimal daily functions [that] are not comparable to typical work activities"). If an ALJ cites daily activities in support of a work finding, they must explain how the activities show Claimant can complete certain types of work. The ALJ here failed to do this.

The Commissioner also argues that the Court must review the record as a whole to evaluate whether substantial evidence supports the ALJ's credibility finding. The Commissioner cites records the ALJ discussed in her summary of the medical evidence to argue that these records support the ALJ's credibility finding. (ECF No. 14 at 16–17). There are four categories of records the Commissioner cites: Claimant's pain mitigation activities, a statement Claimant made to a provider about her joints, records showing positive examination notes, and post-shoulder surgery examinations. (ECF No. 14 at 16–17). As an initial matter, this argument fails because the ALJ did not cite any of this evidence as the reason for her credibility determination. As such, assuming these records were also the basis for the ALJ's credibility determination, the ALJ failed to build a logical bridge to explain how these records demonstrate inconsistences in the opinion of Dr. Mena and CNP Cales and the record evidence. Without any explanation by the ALJ, the Commissioner asks the Court to speculate as to how the records—which demonstrate Claimant's pain—are inconsistent with the experts' restrictions. The Court cannot and will not do so.

19

The Court is therefore not convinced the ALJ's finding regarding the opinions of Dr. Morales Mena and Ms. Cales is supported by substantial evidence as the ALJ failed to sufficiently explain her credibility finding. Based on the foregoing, it is RECOMMENDED that the Court REVERSE the Commissioner of Social Security's nondisability finding and REMAND this case to the Commissioner and the ALJ under Sentence Four of § 405(g). Because remand is warranted on this issue, in the interest of judicial economy, the Court declines to reach the remaining arguments.

## VI. Conclusion

Based on the foregoing, it the Court REVERSES the Commissioner of Social Security's nondisability finding and REMANDS this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

Dated: December 7, 2022

*s/ Carmen E. Henderson*
CARMEN E. HENDERSON
U.S. MAGISTRATE JUDGE